NOTICE
Decision filed 08/17/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 160060-U

NO. 5-16-0060

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| PATTY DAILY, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 09-D-1040 |
| | ) | |
| MICHAEL DAILY, | ) | Honorable |
| | ) | Thomas W. Chapman, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not err in considering the petitioner's claim that the respondent dissipated assets, denying the respondent's request to admit facts, finding that the respondent had dissipated assets, assigning the deficiency from the sale of the marital residence to the respondent, or in its disposition of the parties' real property in Kentucky.

¶ 2    The respondent, Michael Daily (Michael), appeals *pro se* the judgment of the circuit court of Madison County dissolving his marriage to Patty Daily (Patty). He argues: (1) the circuit court erred in considering Patty's claim that he dissipated marital assets where she failed to provide the required statutory notice of her intent to claim dissipation, (2) the

1

circuit court erred in denying his request to admit facts, (3) the trial court erred in finding that he had dissipated marital assets, (4) the trial court erred in assigning to him any deficiency resulting from foreclosure of the marital home, (5) the court erred in its division of certain real property in Kentucky, and (6) the circuit court erred in not awarding him attorney fees resulting from Patty's delay in responding to discovery. We affirm.

¶ 3                                BACKGROUND

¶ 4     The parties were married in Hawaii in 1989. They separated in September 2007, and Patty filed a petition for dissolution of marriage on October 20, 2009. The cause was continued multiple times over the next several years. The parties agreed that neither party would receive maintenance and that each party would retain their sole and separate property, any personal property currently in their respective possession, and any pension or retirement plans held in that party's name alone.

¶ 5     Both Michael and Patty testified at trial, but testimony came mostly from Michael, who testified on his own behalf and as adverse witness for Patty. Michael retired from the United States Army Corps of Engineers (Corps) shortly before the parties separated. He received a pension of $500 per month and $1200 per month from social security. He also received approximately $600 per month from a part time job at Lowes.

¶ 6     Michael had a Thrift Savings Plan (TSP) with the federal government. On May 23, 2007, the parties had executed a written request for full withdrawal of the funds in the TSP. The money was to be withdrawn at the rate of $2500 per month and deposited into a checking account. Patty testified that the money was to be used to pay the mortgage and for other expenses related to the marital home, where Michael continued to reside after

2

their separation. Michael testified that the money was to be used for a business known as EMIP, which the parties formed in 2005 for the purpose of doing business with the Corps on various federal projects. Michael testified that his TSP had a balance of $183,000 at the end of 2007 and that by 2012 the money was gone.

¶ 7 In 2009 or 2010, a disagreement arose between EMIP and the Corps over a project. The disagreement resulted in litigation, and in March 2012 the Corps settled with EMIP for $335,000. By this time EMIP was "defunct." EMIP, having been sued by its investors, settled with them for $200,000. After paying legal fees and other expenses, Michael received approximately $91,000. He deposited approximately $89,000 into a personal savings account.

¶ 8 Michael testified that he invested $10,000 in the stock market. His portfolio performed well initially, with the balance reaching a high of $60,000, but performed poorly thereafter. Michael acknowledged that by the time of a May 28, 2014, settlement conference only $13,000 remained, that the court had entered an order prohibiting him from selling or transferring any stock except under circumstances delineated by the court, and that the proceeds from any sale were to be deposited in a trust account maintained by his attorney. Portfolio assets covered by the May 28, 2014, order continued to be sold pursuant to the terms of the order, but Michael deposited them in a personal account because he was no longer represented by counsel. By the time of trial this account had a balance of approximately $9000.

¶ 9 Michael also testified that he used $52,000 of the remining settlement money to pay himself several years' salary that EMIP owed him. He explained that EMIP had paid him

3

a salary of $1700 monthly until 2010 but was unable to do so thereafter. Michael testified that he used the rest of the settlement money for living expense and to pay the mortgage, homeowner's insurance, and property taxes on the marital residence. Michael ceased paying the mortgage on the marital home in August 2013, resulting in foreclosure. The sale of the house had not been completed by the time of trial, but the projected deficiency was $30,000.

¶ 10 Michael identified plaintiff's exhibit 6 as a statement from Dalton Strategic Investment Services, Inc., (Dalton) for the period June 28, 2013, to July 31, 2013. The statement showed securities worth $60,000 and a cash/money market balance of negative $32,000. Michael explained that the negative cash/money market balance represented margin calls and was the result of having bought the stocks on the margin. Michael acknowledged that the stocks had been purchased with the EMIP settlement money. The statement also shows a $10,000 deposit. Michael explained that he had to deposit $10,000 of his own funds to pay a margin call when the value of the stocks went down. Michael also identified plaintiff's exhibit 9 as a statement from Dalton for the period October 31, 2014, to November 28, 2014. The statement showed securities worth $9744 and a cash/money market balance of negative $2377.70.

¶ 11 Patty testified that she was employed as a flight attendant making $48,000 annually. She testified that when she and Michael separated Michael "begged" her not to take the house because he wanted to live there. Her understanding was that the TSP money would be used to make the mortgage payment on the marital residence, which was $1060,

4

exclusive of property taxes and homeowner's insurance. Property taxes were $4000 annually.

¶ 12 The parties owned several lots in Kentucky, one of which was a lakefront lot. No formal appraisal was done, but Michael estimated the total value of all the lots to be $25,000. Patty estimated the total value to be $45,000.

¶ 13 At the conclusion of the trial the court ordered each party to prepare and submit a proposed judgment. Patty submitted a proposed judgment, but Michael did not. After Michael's attorney withdrew, Michael, proceeding *pro se*, served Patty with a request to admit facts.

¶ 14 On January 7, 2016, the court entered an order dissolving the parties' marriage. The court found that Michael had dissipated marital assets, awarded Patty the remaining $9000 of the settlement funds, found that Michael was solely responsible for the deficiency resulting from the mortgage foreclosure on the marital home, awarded Patty $35,000, representing one-half of the settlement funds dissipated by Michael, awarded Patty the lakefront property in Kentucky, and awarded Michael the remaining Kentucky lots. The court ordered each party to pay their own attorney fees.

¶ 15 Michael subsequently filed *pro se* a motion to have facts deemed admitted. The trial court denied Michel's request, finding that it was filed without leave of court and was not in the proper form. This appeal followed.

¶ 16                                    ANALYSIS

¶ 17                Notice of Intent to Claim Dissipation of Marital Assets

¶ 18    Michael argues first that the circuit court erred in considering Patty's claim that he dissipated marital assets because she failed to provide notice of her intent to claim dissipation of marital assets, as required by section 503(d)(2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d)(2) (West 2016)). We disagree. The notice requirements of section 503(d)(2) were added by Public Act 97-0941 (Pub. Act 97-0941, § 5 (eff. Jan. 1, 2013)) and made applicable only to petitions for dissolution filed on or after January 1, 2013. Patty filed her petition for dissolution on October 20, 2009, long before the notice provisions became applicable. Consequently, she was not required to give notice of her intent to claim dissipation of marital assets.

¶ 19                  Denial of Michael's Request to Deem Facts Admitted

¶ 20    Michael also argues that the circuit court erred in denying his request to deem facts admitted. Michael filed a request to admit facts after the close of evidence. His request focused on Patty's alleged failure to provide notice of her intent to argue that Michael had dissipated marital assets. Illinois Supreme Court Rule 216 allows a party to serve on another party a written request to admit the truth of any specified relevant fact or the genuineness of any specified relevant documents. Ill. S. Ct. R. 216 (eff. May 30, 2008). The purpose of Rule 216 is to expedite litigation by eliminating the need to prove matters which are not in dispute. *Crawford v. Belhaven Realty LLC*, 2018 IL App (1st) 170731, ¶ 46. Requests to admit opinions or conclusions of law are improper, however. *Moy v. Ng*, 371 Ill. App. 3d 957, 961 (2007). A request to admit pursuant to Rule 216 is a

6

discovery procedure. *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 249 (2006). A trial court has broad discretion over the conduct of discovery, and its rulings thereon will not be disturbed on review absent an abuse of that discretion. *Bangaly v. Baggiani*, 2014 IL App (1st) 123760, ¶ 126. An abuse of discretion occurs "only when 'no reasonable person would take the view adopted by the trial court.' " *Id.* (quoting *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003)).

¶ 21   Michael's request to admit did not seek the admission of the truth of any fact or the genuineness of any documents. In fact, Michael did not ask Patty to admit anything. Instead, his request to admit simply made numerous arguments and assertions of fact regarding Patty's claim for dissipation. Consequently, Michael's request to admit facts was improper and the circuit court did not abuse its discretion in denying it.

¶ 22                                Dissipation of Assets

¶ 23   Michael next argues that the trial court erred in finding that he had dissipated marital assets. Although Michael argues that no TSP or EMIP settlement funds were dissipated, the circuit court's finding that he dissipated marital assets appears limited to the EMIP settlement funds. Michael contends that the $91,000 from the EMIP settlement was used to pay his EMIP salary and to pay the mortgage, homeowner's insurance, and property taxes on the marital home once the TSP funds were exhausted.

¶ 24   Section 503(d)(2) of the Act requires the court consider whether either party has dissipated marital assets when dividing the marital estate. 750 ILCS 5/503(d)(2) (West 2016). " 'Dissipation refers to a spouse's use of marital property for his or her sole benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an

7

irreconcilable breakdown.' " *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 66 (quoting *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 700 (2006)). "The concept of dissipation is premised upon waste," and it "contemplates a diminution in the marital estate's value due to a spouse's actions." *In re Marriage of Miller*, 342 Ill. App. 3d 988, 994 (2003).

¶ 25 The party alleging dissipation must first make a *prima facie* case that dissipation has occurred. *Brown*, 2015 IL App (5th) 140062, ¶ 66. A *prima facie* case of dissipation can be made by showing that a spouse's mismanagement of marital assets caused a loss to the marital estate. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 81. Once the party claiming dissipation has made a *prima facie* case for dissipation, "the burden shifts to the party charged with dissipation to show with clear and specific evidence how the funds were spent." *Id.* ¶ 78. "Whether a party's conduct constitutes dissipation depends on the facts and circumstances of the particular case" (*id.* ¶ 79), and the explanation given by the spouse charged with dissipation as to how the funds were spent requires the court to determine his or her credibility (*In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 830 (1994)). Because dissipation is a factual inquiry requiring credibility determinations, we will not reverse a circuit court's finding of dissipation unless it is contrary to the manifest weight of the evidence. *Hamilton*, 2019 IL App (5th) 170295, ¶ 79. A trial court's finding that a party has dissipated assets will be affirmed on review where that party charged fails to adequately document his or her expenditures, and general and vague statements that funds were used to pay bills or spent on marital expenses are insufficient to avoid a finding of dissipation. *Hubbs*, 363 Ill. App. 3d at 700.

¶ 26    The parties agreed that EMIP was a marital asset. Consequently, the settlement funds resulting from its action against the Corps were marital property. After paying litigation expenses and settling a lawsuit brought against EMIP by its investors approximately $89,000 remained. In support of her claim that Michael dissipated the remaining EMIP settlement funds, Patty introduced evidence that in April 2012, shortly after receiving the EMIP settlement funds and paying the aforementioned expense and settlement, Michael had placed the $89,000 in a personal savings account; that he used this money to invest in the stock market; that in July 2013 he had stock worth $60,000; that by May 28, 2014, only $13,000 worth of stock remained; that by November 2014 only $9700 in stock remained; and that by the time of trial only $9000 of the original $89,000 remained. This evidence was sufficient to set forth a *prima facie* case that Michael dissipated these funds.

¶ 27    Michael contends that the $91,000 EMIP settlement money was used as follows: $52,000 for his unpaid EMIP salary for the years 2009 and 2010; $26,250 for his unpaid EMIP salary for 2011 through March 2012; $8480 for mortgage payments after the TSP funds were exhausted; $4030 for homeowner's insurance for the years 2012 through 2015; $990 for Lyon County property taxes; and $28.13 remaining funds that were expended prior to 2014. Patty responds that Michael failed to support his explanation of how the settlement funds were expended with clear and specific evidence. We agree with Patty.

¶ 28    Initially, we note that Michael's explanation of how he spent the remining EMIP settlement funds differs from that he provided at trial. There, Michael testified that he invested $10,000 in the stock market, used $52,000 to pay several years' salary that EMIP

9

owed him, and used the rest for living expenses and to pay the mortgage, homeowner's insurance, and property taxes on the marital residence. We further note that the only documentary evidence Michael provided to support his testimony was an unsigned letter on EMIP letterhead, dated August 22, 2010, and addressed "To Whom It May Concern." This letter indicates that EMIP owed Michael $53,507 in salary for the period from June 30, 2010, through January 30, 2011. This document does not support Michael's explanation, either at trial or on appeal, of how much of the EMIP settlement money was used pay his salary and for what periods. Michael provided no documentary evidence supporting his testimony regarding how much of the settlement funds were invested in the stock market, how much was used to pay the mortgage and related expenses on the marital residence, and how much was used for living expenses. Given the absence of any supporting documentation, the circuit court was not required to believe Michael's testimony. Consequently, we cannot say that the circuit court's determination that Michael failed to rebut the *prima facie* case of dissipation and that he dissipated marital assets is contrary to the manifest weight of the evidence.

¶ 29                                    Marital Home

¶ 30    Michael next argues that the circuit court erred in assigning the entire deficiency resulting from the foreclosure and sale of the marital home to him and that Patty should be responsible for half of the projected $30,000 deficiency. He contends that she could have prevented the foreclosure by making the mortgage payments.

¶ 31    A circuit court in a dissolution proceeding must allocate the marital assets and the marital debts equitably. *Hamilton*, 2019 IL App (5th) 170295, ¶ 51. "An equitable

10

allocation of debts need not be mathematically equal. *Id.* A circuit court has broad discretion in distributing marital assets and debt, and its decisions thereon will not be disturbed on review absent an abuse of that discretion. See *Hubbs*, 363 Ill. App. 3d at 704.

¶ 32 At trial, Patty testified that Michael "begged" her to let him stay in the house and that he promised to make the mortgage payments. She further testified that she agreed to let Michael withdraw $2500 per month from the TSP account so that he could make the mortgage payment. Michael disputed this, but he remained in possession of the marital residence from the time of separation through the time of trial, and he paid the mortgage until August of 2013. The court found that "it is clear that [Michael] was to pay the mortgage and expenses associated with the former marital residence, vacated by [Patty] and occupied by [Michael]." Given the evidence adduced at trial, we cannot find that the circuit court abused its discretion in assigning any deficiency judgment resulting from the foreclosure on the marital home to Michael.

¶ 33                                    Kentucky Lots

¶ 34 The marital estate in this case included certain real property in Lyon County, Kentucky, consisting of a lakefront lot and 28 other lots. The lakefront lot was not accessible by road, but the other lots were. Some lots had water and sewer hookups while others did not. Following a May 28, 2014, settlement conference, the court ordered the Kentucky lots to be sold. For reasons which are unclear from the record, this was never done. The property was never appraised, but at trial Michael estimated the value of the lakefront lot to be approximately $10,000 and the total value of the remining lots to be approximately $15,000. When asked how he would like the court to dispose of the property

11

Michael testified that he would like to see the lakefront lot go to his children and for the court to divide the remaining lots equally. No mention was made of the prior court order. The court awarded Patty the lakefront property and awarded Michael the remaining lots. Michael now argues that the Kentucky lots should be sold as directed by the May 28, 2014, order and each party awarded one-half of the proceeds.

¶ 35    Under the doctrine of invited error, a party cannot complain of an error which that party induced the court to make or to which that party acquiesced. *In re Marriage of Shulga*, 2019 IL App (1st) 182028, ¶ 29. Here, Michael was aware that the court had previously ordered the Kentucky property to be sold but made no mention of this at trial. In fact, when asked how he would like to court to dispose of the Kentucky property, Michael requested a disposition that differed from what the court had previously ordered. He cannot now be heard to complain that the prior order was not followed. Moreover, the court awarded Michael all the non-lakefront lots, which is more than he had requested, and, by Michael's own estimation, the value of these lots exceeded the value of the lakefront lot awarded to Patty. Under these circumstances, we cannot find the trial court's disposition of the Kentucky property to be an abuse of discretion.

¶ 36                                          Attorney Fees

¶ 37    Finally, Michael argues that the circuit court erred in failing to award him attorney fees which accumulated from September 21, 2011, to July 31, 2013, because such fees were incurred as a result of Patty's failure to comply with discovery requests and orders.

¶ 38    On September 21, 2011, Patty was given 45 days in which to comply with Michael's discovery requests. When she failed to do so Michael filed a motion to compel and, later,

12

a motion for sanctions seeking, *inter alia*, an award of reasonable attorney fees. On February 22, 2012, the trial court found Patty in contempt for failing to comply with discovery, ordered that she could purge the contempt finding by complying with discovery within 21 days, and reserved ruling on Michael's motion for sanctions. Over the next approximately year and a half numerous hearings were held on Patty's discovery compliance and Michael's request for sanctions, with the issue of sanctions being reserved each time. Following a July 31, 2013, pretrial conference, the court ordered an appraisal of the Kentucky lots if the parties could not agree on a value and continued the cause until October 23, 2013. The July 31, 2013, order makes no mention of discovery compliance or Michael's motion for sanctions. The cause was again continued multiple times, but there was no further mention of discovery compliance or sanctions prior to trial. At trial, Michael introduced no evidence or made any argument regarding his demand for attorney fees. The court ultimately ordered each party to pay their own attorney fees.

¶ 39 Although not entirely clear from the record, it appears from the foregoing chronology that Patty had fully complied with discovery by July 31, 2013, and the court ultimately declined to impose any sanctions, ordering each party to pay their own attorney fees. Whether to impose sanctions for discovery violations is a matter for the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of that discretion. *In re Marriage of Booher*, 313 Ill. App. 3d 356, 359 (2000). Michael claims that the court should have granted his request for attorney fees but offers no argument as to why its decision not to constitutes an abuse of discretion. Consequently, we will not disturb its decision.

13

¶ 40                                    CONCLUSION

¶ 41    Patty was not required to notify Michael of her intent to claim dissipation of assets, and the circuit court's finding that Michael had dissipated marital assets is not contrary to the manifest weight of the evidence.  The circuit court did not abuse its discretion in denying Michael's request to deem facts admitted where such "request" did not seek the admission of any facts or the authentication of any documents, but simply made arguments regarding Patty's failure to notify him that she would be claiming dissipation of assets.


¶ 42    Affirmed.